## GATES v. ARKANSAS & L. M. RY. CO. et al.

### No. 5611.

Court of Appeal of Louisiana. Second Circuit.

April 1, 1938.

Dhu Thompson, of Monroe, for appellant.

Theus, Grisham, Davis & Leigh, of Monroe, for appellees.

TALIAFERRO, Judge.

John W. Gates met instant death from a violent collision between his coupé automobile and the rear portion of a steel gondola, the most northerly car of a freight train of defendant, on the Sterling-ton-Monroe concrete highway at or near the east boundary line of the city of Monroe, La., about the hour of 8 o'clock p. m., April 21, 1936. His widow, individually and as tutrix of her two minor children, issue of her marriage to deceased, brings suit to recover damages by them expe-

rienced because of his death. Negligence and carelessness on the part of the railroad company, its agents and employees, is charged to have been the sole cause of the collision and resultant death. A summary of the allegations of negligence contained in the petition follows:

That defendant's train was suddenly backed (northerly) onto and across said highway and collided with deceased's car, then being driven by him; that the night was dark, a drizzling rain was falling, and the string of cars, constituting the train, had no lights or other signals thereon to give notice of its presence to automobiles or pedestrians traveling the highway; nor was said crossing protected by a watchman, flagman or other servant of defendant so as to warn traffic on said highway of the presence and movements of said train; nor were there any signals, signs, or warning lights of any character at said crossing to warn or give notice to deceased that he was approaching a railroad crossing or that a string of freight cars was being backed toward and onto the crossing; that deceased was ignorant of the hazardous situation then existing on and about the crossing, in fact, was ignorant that the crossing was there, and remained so until within a few feet from it; that all of said signs, signals, and notices should have been given by defendant railway company, and its failure to so do constitutes gross negligence which was the sole cause of the death of deceased.

In the alternative, it is alleged that should it be found and held that said crossing was protected by a servant of the railway company at the time of accident, in such event it is averred that the light used by said servant was insufficient to give warning of the approach of defendant's cars or the movements of its train; that, because of the nature of the surroundings at the place of the accident, traffic conditions thereat, and the angle at which said train was backing, etc., extra precautions on defendant's part should then and there have been exercised, but that it failed in this duty.

The railroad company's insurer, Ætna Casualty & Surety Company, is also joined as defendant.

Defendants admit the alleged accident and death therein of John W. Gates, but deny that it either was the result of, or was contributed to to any extent by, any negligence or carelessness of the railroad company, its agents or servants. They af-firmatively set up that flagmen with adequate lights were guarding said crossing at the time of the accident and that also signs, giving notice to the public of the crossing, had been erected on the highway near thereto; that the crossing and the train thereon were easily discernible, and despite same and despite all of said safety precautions and the existence of said signs, said deceased, as he approached said crossing at an excessive rate of speed, did not stop, look or listen, as was his legal duty, but drove heedlessly on until he crashed his car into defendant's gondola car, then stationary on the highway. Defendants further allege, on information and belief, that immediately prior to the time of the accident deceased had been drinking intoxicating liquor and was driving his car while under the influence of such liquors. It is additionally alleged that deceased, because of his own gross negligence and carelessness, in the respects herein described, met death. This negligence, in the alternative, is also alleged upon in bar of recovery by plaintiff.

Plaintiff's demands were rejected and she appealed.

■ Defendant's track runs from Monroe via Bastrop, La., to Crosset, Ark. It operates no passenger trains thereon. The track out of Monroe extends in a northeasterly direction. The highway from Bastrop to Monroe, for a considerable distance above and below the scene of the accident, runs almost north and south. Therefore, it crosses the track there at an acute angle. According to the map in the record, the track traverses the road diagonally for a distance of approximately 120 feet. There is a slight rise in the surface of the highway on both sides of and as it approaches the track, the crest of which being not over 2 feet above the main line of the road.

Defendant's engine with a dozen empty cars was returning from Bastrop to Monroe. Before reaching the crossing, all cars except one were detached and left on the main line. The engine with the one car crossed the highway and then backed northeasterly over a switch track (east of and a few feet from the main line) to connect with some ten or twelve empty gondola cars spotted thereon. This being done, the engine, with its train of cars, proceeded southerly from the switch track onto the main line and across the highway, with the intention of backing up again and coupling with the

cars firstly left on the main track. These cars measure, on an average, 45 feet in length. The train stopped at the flagman's signal as its rear car pre-empted the western and central parts of the concrete slab, 18 feet wide. This car's rear end extended northeasterly beyond the center of the road a few feet. It was in this position when run into by deceased, traveling southerly. It was necessary that the entire train clear the switch track so that the switch could be thrown to admit of the train again backing up on the main line to connect with the string of cars originally left thereon.

Plaintiff contends, and there is some testimony to support it, that the train was backing across the road when Gates ran into the gondola, but the decided preponderance of the testimony, given by witnesses in the better position to know, including one for plaintiff, is against this contention. It is not argued nor intimated that Gates' car was pushed to any extent after the collision. This would have occurred had the train moved northerly thereafter. We are certain it did not stop simultaneously with the collision. The left front part of the coupé was wedged under the gondola and remained there until removed by hand power. Its left front end struck the gondola at an angle at or near the stirrup on its west side, only a few feet from its corner. The coupé's position, after the accident, lends support to the theory that Gates, on observing the gondola, tried to avert a collision by veering to his right. Had he turned to his left, the tragic results might not have been fatal. There was sufficient space on that side for an automobile to pass.

We are also quite clear in the opinion that the crossing was adequately guarded by Mr. Nutt, a flagman, and by Simon Smith, a negro brakeman. The testimony convinces us of this fact. Surely some member of the train crew had to be at the crossing to signal the engineer, some 450 or 500 feet away, so that he could intelligently direct the train's movements. Before the signal was given to back the train northerly over the main line, after having stopped, Nutt said he saw and heard the Gates car coming down the highway at a very rapid speed and making considerable noise. He and the brakeman testified that they immediately began to wave their hand lanterns frantically in an effort to attract Gates' attention to the train's presence, and also holloed at him. He was oblivious to all these signals and the collision followed. They say that Smith had to jump suddenly from the concrete to the west shoulder of the road to avert being run over by Gates' car. The physical condition of the coupé after the accident demonstrates conclusively that the impact was violent. This car was a 1929 model. It had been owned by Gates for not over two months. It is most probable that its headlights were not as brilliant as they should have been, and, if so, their inefficiency was further reduced by weather conditions then prevailing.

The lanterns used by defendant's servants at the crossing in their effort to stop Gates were of standard make and power. Lanterns of this kind are used generally by all railroads for signaling purposes. For this reason, the alternative position of plaintiff regarding the inefficiency of these lanterns has no basis to rest upon.

There were no lights at the end or on the gondola car with which Gates collided. Under the conditions existing at the crossing at the time of the collision, this was not necessary and the absence of such lights does not constitute negligence nor disclose carelessness on the part of the train crew. If Gates failed to observe the flagman and brakeman on the highway, waving lanterns, as was done, surely he would not have observed a stationary light on the gondola. This would not have afforded him additional security from the results of his own imprudence and lack of care. Since the crossing was amply protected to warn traffic of conditions thereat at the time, and it was the intention to immediately back the train again to the east side of the highway, no duty devolved upon the railway's agents for the protection of the crossing beyond that which we find to have been discharged.

The traveling public is not excused from the exercise of every reasonable care and precaution needful to its safety while using the highways of the state, especially those within the limits of a city where trains are known to regularly travel, and thereby throw all responsibility upon those operating such trains. Duty in this respect is reciprocal.

It is the general rule, oft adopted and applied by the courts of this state, that the presence of a train across a highway constitutes a most impressive notice to motorists that the road is temporarily

blocked to traffic; and no collision with such train will or can occur if a motorist is observing the equally well-established rule to the effect that he should operate his car at such speed that it can be stopped within the distance illuminated by its lights.

At the time of the accident, there was on the west shoulder of the road, being Gates' right-hand side, the sign required to be so placed by law, bearing the words: "Stop—Louisiana Law." These words were painted in large letters on a board surface at least 3 feet square and possibly larger. The sign was affixed to a post some 6 or 7 feet high. At about 500 feet north of the crossing, also on the west shoulder of the road, there was another sign, the lower side of which was not over 5 feet above the ground. It was of circular form, the surface of which was crossed at right angles by two heavily dark-painted lines, a few inches wide. In the two upper angles of the cross was painted, in large letters, "R R," which, to any reasonable person, indicated the proximity of a railroad track. The first sign, above described, was approximately 85 feet north of the spot where the cars collided. There is considerable testimony in the record tending to show that this particular sign was not easily seen, in fact, could not be seen by a motorist at night, traveling southerly, due to its location some 8 or 10 feet from the concrete part of the road. The evidence is not conclusive of the contention. Such a sign was erected in obedience to law and designed to give notice of the presence of the railway track. The letters of the words on it are bold and easily read. The very fact that such signs adorn the road is sufficient to impress any one, whether he is able to read them or not, that danger may lie ahead; sufficient to require of a motorist the utmost precaution as he goes forward, and to demand of him, for his own safety, if no more, that he maintain such control of his vehicle as to be able to bring it to a stop, if not instantly, surely within the distance illuminated by its headlights. If Gates did not observe these signs, the fault was his alone. It is true that visibility was to some extent affected by atmospheric conditions then prevailing, and it is also probably true that the lights of the old coupé were not strong; if so, these conditions but demanded of Gates a greater degree of precaution than would be required of him under more favorable conditions.

For possibly two hours prior to the accident, Gates had been driving the coupé in and about the cities of West Monroe and Monroe. He left his home with a brother-in-law. When the collision occurred, he was accompanied by a friend by the name of Valentine. He was not produced as a witness, nor was his testimony taken, though his whereabouts was known. A partially empty bottle of whisky was taken from the coupé by an officer immediately after the collision and another one, empty, was picked up beside the car. From these facts and circumstances, appellees argue that Gates' intoxication explains his utter disregard of all signs and precautions when operating his car just prior to the collision. Without making a definite finding on this question (as it is unnecessary to a decision), we simply say there is much to sustain the contention.

We are of the opinion that the lower court's judgment is well supported by the record in the case, and it is affirmed.